JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN MESSING, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| v. | |
| PETROLEO BRASILEIRO S.A. - PETROBRAS, | |
| Defendants. | |

Case No. **14 CV 9847**

**CLASS ACTION**

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

JUDGE DANIELS

RECEIVED
DEC 12 2014

<u>CLASS ACTION COMPLAINT</u>

Plaintiff Jonathan Messing ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Petroleo Brasileiro S.A. - Petrobras, ("Petrobras" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired American Depositary Shares ("ADSs") of Petrobras between May 20, 2010 and November 21, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Petroleo Brasileiro S.A. - Petrobras explores for and produces oil and natural gas. The Company refines, markets, and supplies oil products. Petrobras operates oil tankers, distribution pipelines, marine, river and lake terminals, thermal power plants, fertilizer plants, and petrochemical units. The Company operates in South America and elsewhere around the world. As of December 31, 2013, the company had developed oil and gas reserves of 7,605.8 million barrels of oil equivalent ("mmboe") and undeveloped reserves of 4,934.5 mmboe in Brazil. Petrobras was founded in 1953, is headquartered in Rio de Janeiro, Brazil, and its ADSs trade on the NYSE under the ticker symbol "PBR".

3.      During the Class Period, Defendant made materially false and misleading statements by misrepresenting facts and failing to disclose a multi-year, multi-billion dollar money-laundering and bribery scheme. Specifically, Petrobras's senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies such as Odebrecht S.A. ("Odebrecht") and SBM Offshore NV ("SBM") that were awarded the contracts illegally. These illegal acts caused the Company to overstate its property, plant and equipment line item on its balance sheet because the overstated amounts paid on inflated third party contracts were carried as assets on the balance sheet.

4.     In addition, this illegal bribery and kickback scheme further violated representations Petrobras made to its investors concerning the Company's own anti-corruption and anti-bribery practices under its Code of Ethics. During the Class Period, Petrobras filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Petrobras's internal controls and procedures. Petrobras consistently represented that the "Company identified no change in its internal controls over financial reporting."

5.     Further, during the Class Period, the Company's Chief Executive Officers, Jose Sergio Gabrielli de Azevedo ("Azevedo") and Maria das Gracas Silva Foster ("Foster"), and its Chief Financial Officer, acting on behalf of Petrobras, signed certifications pursuant to the Sarbanes-Oxley Act of 2002. Those certifications contained false and misleading representations that Petrobras had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

6.     Foster was the Company's Chief Gas and Power Officer from September 21, 2007 through January 2012. Since February 2012, Foster has been the Company's Chief Executive Officer. Since July 2012, Foster has been the Company's Chief International Officer. Foster has been a member of the Company's Board of Directors since February 2012.

7.     According to various media reports, Petrobras's top executives, including Paulo Roberto Costa ("Costa") and Renato de Souza Duque ("Duque"), were principal executives in the money laundering and bribery scheme that has been estimated to total 10 billion Brazilian reais or approximately $4.4 billion. Costa was a member of Petrobras's senior management as the Company's Chief Downstream Officer from May 14, 2004 through April 2012. As the Chief Downstream Officer, Costa was the top executive in charge of Petrobras's refining division. As

such, Costa was intimately aware and had knowledge of the needs of the Company's refineries, including the state of current and future contracts. Duque was also a member of Petrobras's senior management as the Company's Chief Services Officer from January 31, 2003 through February 2012. As the Chief Services Officer, Duque was in charge of Petrobras's engineering and services division and worked closely with the Company's refining division. Duque's engineering division was co-responsible for Abreu e Lima contracts.

8.     Costa and Duque were senior officers of Petrobras and their knowledge and active participation in the scheme are attributable to Petrobras. Costa and Duque had the power to bind Petrobras to the inflated contracts, and as senior officers of Petrobras, they routinely recommended such contracts to Petrobras's executive board for approval. According to Costa's testimony, which was released by a Brazilian federal court, Costa admitted that for, at least, seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves." Odebrecht is one of those contractors that have been specifically named by Costa. Odebrecht's offices were subsequently searched, and documents were seized that concerned Odebrecht grossly overbilling Petrobras in an $835 million contract. SBM, another contractor of Petrobras, has admitted to bribing individuals related to Petrobras in an amount in excess of $139 million, and has been fined by Dutch authorities for improper payments to sales agents in several countries including Brazil from 2007 through 201.

9.     Besides Petrobras's top executives, the illegal bribery and kickback scheme also involved politicians and a group of, at least, 16 contractors who formed a cartel that assured that its members of the cartel would win Petrobras's major contracts including ones related to an oil

- 4 -

refinery called "Pasadena" located in Texas and the Abreu e Lima refinery ("RNEST") located in Pernambuco, Brazil. According to Brazilian prosecutors and the Brazilian Federal Police, Costa granted contracts to these "Brazilian construction companies that systemically inflated their costs by as much as 20%." After winning the contracts, "the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Mr. Costa, Brazilian politicians and money launderers" from the profits received from the inflated contracts.

10.     As of November 14, 2014, the Brazilian Federal Police, has arrested at least 24 suspects in connection with the money laundering and bribery scheme, including Alberto Youssef ("Youssef"), a black market money launderer. Youssef was considered to be the scheme operator and has been promised of reduced sentences by Brazilian prosecutors in exchange for his cooperation. Youssef testified that the bribery scheme was rampant throughout Petrobras and its subsidiaries, and that each subsidiary's board split the bribery money with its respective politicians.

11.     Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company overstated its property, plant, and equipment on its balance sheet by overpricing contracts to certain companies relating to its refineries and operations and accepting kickbacks from construction companies approved for those contracts; (2) the Company was receiving multi-billion dollar bribes, from third party contractors to secure contracts from Petrobras; (3) the Company was in violation of its own Code of Ethics as its employees and executives were routinely accepting bribes from certain construction companies; (4) the Company's internal controls over financial reporting were ineffective and deficient; and (5) as a result of the

foregoing, Petrobras's public statements were materially false and misleading at all relevant times.

12.     Through a series of revelations including the arrests of Costa and Duque and admission that the Company may have to adjust its historical financial statements to recognize the difference in overpricing its construction contracts, the closing price of Petrobras's ADSs have declined from a $19.38 per ADS on September 5, 2014 to $10.50 per ADS on November 24, 2014, representing a decline of $8.88 per ADS or 46%.

13.     As a result of defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, acquired Petrobras's ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant Petrobras is an integrated oil and gas company that is the largest corporation in Brazil, in terms of revenue. The Company operates nearly all of the refining capacity in Brazil. As of December 31, 2013, the Brazilian federal government owned 28.67% of Petrobras outstanding capital stock and 50.26% of its common shares and is the controlling shareholder of Petrobras. Petrobras is incorporated in Brazil and its ADSs are listed on the NYSE under the symbol "PBR." The Company also operates in 17 other countries, including the United States where it produces oil and gas and has refining operations. Petrobras has an office at 570 Lexington Avenue, 43rd Floor, New York, NY 10022. Petrobras America Inc. is located at 10350 Richmond Avenue, Suite 1400, Houston, Texas 77042.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Petroleo Brasileiro S.A. - Petrobras explores for and produces oil and natural gas. The Company refines, markets, and supplies oil products. Petrobras operates oil tankers, distribution pipelines, marine, river and lake terminals, thermal power plants, fertilizer plants, and petrochemical units. The Company operates in South America and elsewhere around the world. Petrobras was founded in 1953, is headquartered in Rio de Janeiro, Brazil, and its ADSs trade on the NYSE under the ticker symbol "PBR".

**Materially False and Misleading**
**Statements Issued During the Period**

21.     On May 20, 2010, the Company filed its annual report for the year ended December 31, 2009 on a Form 20-F with the SEC (the "2009 20-F"). The 2009 20-F was signed by Jose Sergio Gabrielli de Azevedo ("Azevedo"), the Company's then CEO, and Almir Guilherme Barbassa ("Barbassa"), the Company's Chief Financial Officer and Chief Investor Relations Officer. The Form 20-F stated the Company's financial results and financial position. In addition, the 2009 Form 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Azevedo and Barbassa. The SOX certifications stated that the financial information contained in the 2009 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2009 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Azevedo and Barbassa have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." Azevedo and Barbassa's statements were attributable to the Company.

22.     In addition, the 2009 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended

December 31, 2009, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

23.     The 2009 20-F incorporated the Petrobras Code of Ethics ("Code"), available on the Company's corporate website and stated that the Code "is applicable to all employees, the board of executive officers and the board of directors." The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."

24.     These statements were materially misleading because the money laundering and bribery scheme that was ongoing in 2009 was in blatant violation of the Code, which expressly stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

25.     The 2009 20-F also represented that the Company's assets under property, plant and equipment ("PP&E") were worth $136.2 billion at the end of 2009. Further, the Form 2009 20-F represented that under the Company's PP&E, "costs incurred in connection with the exploration, development, and production of oil and gas are recorded in accordance with the 'successful efforts' method," which required that costs incurred "in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized." These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

26.     The 2009 20-F also stated that:

Odebrecht, Petrobras, Petroquisa and Braskem executed an agreement, seeking to regulate their commercial and corporate relationship in the Petrochemical Complex of the State of Rio de Janeiro (COMPERJ) and in the Petrochemical Complex of Suape (Suape Complex) .... These transactions are in alignment with the interests of Odebrecht and Petrobras to integrate their petrochemical businesses in Braskem.

27.     This statement was false and misleading because Petrobras failed to disclose to the market, that the Company's executives, including Costa and Duque, were inflating construction contracts and awarding them to a cartel of selected construction companies, including Odebrecht and SBM, after receiving significant bribes.

28.     On May 26, 2011 the, Company filed an annual report for the year ended December 31, 2010 on Form 20-F with the SEC (the "2010 20-F"), which was signed by Azevedo, and Barbassa, and stated the Company's financial results and financial position. The 2010 20-F Contained signed certifications pursuant to SOX by Azevedo and Barbassa, stating that the financial information contained in the Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting, Specifically, the certifications represented that the 2010 20-F did "not contain any untrue statement or a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Azevedo and Barbassa have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information: and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." These statements by Azevedo and Barbassa were attributable to the Company.

29.     In addition, the 2010 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

30.     The 2010 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, the board of executive officers and the board of directors." The 2010 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Pebrobras Ethics Commission" "to promote compliance with ethical principles."

31.     These statements were materially misleading because the money laundering and bribery scheme ongoing in 2010 was in violation of the Code which stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

32.     The 2010 20-F represented that the Company "invested a total of U.S. $6,681 million in our refineries" and its PP&E amounted to $218.6 billion at the end of 2010. Further, the Form 20-F represented that under the Company's PP&E, "costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the 'successful efforts' method," where "costs are accumulated on a field-by-field basis with certain exploratory expenditures and exploratory dry holes being expensed as incurred." These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E and investments in refineries were adversely impacted by illegal

activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

33.     The Company failed to disclose to the market that the Company's senior executives who had the ability to bind the Company to multi-billion dollar contracts were active participants in the money laundering and bribery scheme. Specifically, senior executives such as Costa and Duque were signing off on the inflated construction contracts and recommending them to Petrobras's executive boards for approval. In essence, through their senior positions in the Company, Costa and Duque had the authority to award the inflated construction contracts to a select group of construction companies including Odebrecht after receiving significant bribes, and as a result, the Company falsely represented that Petrobras's transaction with Odebrecht "are in alignment with the interests of Odebrecht and Petrobras."

34.     On April 2, 2012, the Company filed an annual report for the year ended December 31, 2011 on a Form 20-F with the SEC (the "2011 20-F"), which was signed by Barbassa and Foster, and stated the Company's financial results and financial position. In addition, the 2011 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Barbassa and Foster have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's

ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." These certifications are attributable to the Company.

35.     In addition, the 2011 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

36.     The 2011 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, and the members of the board of executive officers and the board of directors." The 2011 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."

37.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2011 was in violation of the Code, which stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

38.     The 2011 20-F represented that the Company's PP&E amounted to $182.5 billion at the end of 20 11 and the Company "invested a total of U.S. $5,618.75 million in our refineries, of which U.S. $1,208.89 million was invested for hydrotreating units to improve the quality of our diesel and gasoline and U.S. $1,039.19 million for coking units to convert heavy oil into lighter products." The Company represented that the "most important tangible assets are

wells, platforms, refining facilities, pipelines, vessels and other transportation assets, and power plants." Also the Form 20-F represented that under the Company's PP&E, "costs incurred in connection with the exploration, development and production of oil and gas are accounted for in accordance with the successful efforts method" which required "that capitalization of costs incurred in connection with the development of proved reserve areas and successful exploratory wells." Further, the 2011 20-F represented, unlike prior Form 20-Fs, that PP&E is measured "at the cos of acquisition or construction, which represents the incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

39.     These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E and investments in refineries were adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

40.     On April 29, 2013, the Company filed an annual report for the year ended December 31, 2012 on a Form 20-F with the SEC (the "2012 20-F"), which was signed by Barbassa and Foster, and stated the Company's financial results and financial position. In addition, the 2012 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, and stated that the financial information contained in the Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2012 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstallces under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Barbassa and Foster have

- 14 -

disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

41.     In addition, the 2012 20-F stated that the management "has not identified any change in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

42.     The 2012 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, executive officers and the board of directors." The 2012 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" which is "responsible for promoting corporate compliance with ethical principles."

43.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2012 was in violation of the Code, which stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

44.     The 2012 20-F represented that the Company's PP&E amounted to $204.9 billion at the end of 2012 and the Company "invested a total of U.S. $3,435 million in our refineries, of which U.S. $2,581 million was invested for hydrotreating units to improve the quality of our diesel and gasoline and U.S. $419 million for coking unites to convert heavy oil

- 15 -

into lighter products." The Company also represented that the "most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, and power plants."

45.     Further, the 2012 20-F represented that PP&E "are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyper-inflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses." Also, the 2012 20-F represented that "costs included in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting" which includes the "[c]osts related to the construction, installation and completion of infrastructure facilities, such as platforms, pipelines, drilling of development wells and other related costs incurred, in connection with the development of proved reserve areas and successful exploratory wells are capitalized within property, plant and equipment."

46.     These statements, were false and misleading because the Company, failed to disclose that the true value of the Company's PP&E and investments in refineries were adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

47.     On April 30, 2014, after the market closed, the Company filed an annual report for the year ended December 31, 2013 on Form 20-F with the SEC (the "2013 20-F"), which was signed by Barbassa and Foster, and reiterated the Company's previously announced financial results and financial position. In addition, the 2013 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2013 20-F

was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the Form 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstance under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Foster and Barbassa have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

48.     In addition, the 2013 20-F stated that the management "has not identified any change in its internal control over financial reporting during the fiscal year ended December 31, 2013, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

49.     The 2013 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, executive officers and the board of directors." The 2013 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" which is "responsible for promoting corporate compliance with ethical principles."

50.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2013 was in violation of the Code, which stated that the Company's employees, executive officers and members of the board of directors

were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

51.      The 2013 20-F represented that the Company's PP&E amounted to $227.9 billion at the end of 2013 and the Company "invested a total of U.S. $3,162 million in our refineries, of which U.S. $2,512 million was invested for hydrotreating units to improve the quality of our diesel and gasoline and U.S. $174 million for coking units to convert heavy oil into lighter products." The Company also represented that the "most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, power plants as well as fertilizers and biodiesels plants."

52.      Further, the 2013 20-F represented that PP&E "are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses." Also, the 2013 20-F represented that "costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting" which includes the "[c]osts related to the construction, installation and completion of infrastructure facilities, such as platforms, pipelines, drilling of development wells and other related costs incurred in connection the development of proved reserve areas and successful exploratory wells are capitalized within property, plant and equipment."

53.      These statements, were false and misleading because the Company, failed to disclose that the true value of the Company's PP&E and investments in refineries were adversely

impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

54.     The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each internal commission is established by our management." Significantly the 2013 20-F represented that on "March 31, 2014 , our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

55.     On May 27, 2014, fifteen days before Foster testified on June 11, 2014 before a congressional investigation committee, the Comissao Parlamentar de Inquerito ("CPI"), Petrobras received a letter from SBM warning the Company that Netherland's Public Ministry was inquiring into bribery payments, by SBM to Petrobras's employees.[1] Notwithstanding that knowledge, Foster falsely represented to the CPI and to the investing public in her testimony on June 11, 2014, that no irregularities were discovered, even though "she knew about several evidences of irregularities"[2] prior to her testimony on June 11,2014.

56.     The statements referenced in ¶¶ 21-23, 25-26, 28-30, 32, 34-36, 38, 40-42, 44-45, 47-49, 51-52, 54-55 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) the Company overstated its property, plant, and equipment on its balance sheet by overpricing contracts to certain companies relating to its refineries and operations and accepting kickbacks from construction companies approved for those contracts; (2) the Company was receiving multi-billion dollar bribes, from

---

[1] *Opposition Party Demands Graca Foster's Immediate Withdrawal From Petrobras's Presidency,* FOLHA DE S.PAULO, November 20, 2014.

[2] *Id.*

third party contractors to secure contracts from Petrobras; (3) the Company was in violation of its own Code of Ethics as its employees and executives were routinely accepting bribes from certain construction companies; (4) the Company's internal controls over financial reporting were ineffective and deficient; and (5) as a result of the foregoing, Petrobras's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

57.     By September 7, 2014, certain facts with respect to the corruption at Petrobras became publicly known by virtue of Costa's arrest and a Brazilian criminal investigation.

58.     On September 7, 2014, after the market closed, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election." The article cites a Brazilian, magazine, *Veja*, which reported that Costa revealed "a group of politicians, including members and allies of Rousseff's Workers' Party" had accepted bribes linked to Petrobras contracts.

59.     As a result of this news, that the bribes paid to Brazilian politicians had been linked to Petrobras contracts, Petrobras's ADSs declined $1.03 per ADS or more than 5%, to close at $18.35 on September 8, 2014.

60.     On September 8, 2014, after the market closed, Petrobras acknowledged the corruption at the Company by issuing a statement concerning Costa's arrest and the federal criminal investigation. Specifically, a statement issued by Petrobras stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company-employees, do not represent the conduct of the Petrobras institution and its workforce.

- 20 -

61.     On this statement by the Company, acknowledging the corruption, Petrobras's ADSs declined $0.52 per ADS or nearly 3%, to close at $1 7.83 per ADS on September 9, 2014.

62.     On September 30, 2014, after the market closed, *Bloomberg News* published an article stating that Duque "stamped and signed at least 6.6 billion Brazilian reais ($2.7 billion) in contracts for the Abreu e Lima refinery" and recommended to Petrobras's executive board to approve the over-billed contracts in late 2009. Further, Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed."

63.     On this news, Petrobras's ADSs declined $0.89 per ADS or more than 6%, to close at $13.30 per ADS on October 1, 2014.

64.     On October 9, 2014, after the market closed, the Brazilian federal court released Costa's testimony. Costa testified that kickbacks were paid to members of the Workers' Party, the political party of the President of Brazil, Dilma Rousseff ("Rousseff"). According to an article by, *The Wall Street Journal*, Costa "alleged that a certain percentage of contracts at the refining unit at Petrobras were to go to members of the Workers' Party."

65.     The release of Costa's testimony by the Brazilian federal court, as independently confirmed by *TheStreet.com* caused Petrobras's ADSs to decline $1.15 per ADS or nearly 7%, closing at $15.62 per ADS on October 10, 2014.

66.     On October 16, 2014, before the market opened, it was reported by *Bloomberg* that the Federal Court of Accounts ("TCU") published a report concluding that Petrobras will spend 60 percent more than originally budgeted at one of its refineries. Specifically, the TCU concluded that Petrobras will pay $21.6 billion to complete the Complexo Petroquimico do Rio de Janeiro ("Comperj") complex. Comperj is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010 and is scheduled to start up on 2015. The

TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Ccimperj." Moreover, the TCU concluded that Petrobras's management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls." One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way." The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

67.     On the release of the TCU's report, Petrobras's ADSs declined $1.05 per ADS or nearly 7%, to close at $14.50 per ADS on October 16, 2014.

68.     On Saturday, October 18, 2014, during a news conference during the day, Rousseff admitted that there was embezzlement of public money in Petrobras and that the Brazilian government would seek reimbursement of any money illegally diverted from the Company.

69.     As a result of the admission by Rousseff of embezzlement in the Company, Petrobras's ADSs declined $0.93 per ADS or more than 6%, to close at $14.00 per ADS on October 20, 2014.

70.     On October 20, 2014, after the market closed, *Bloomberg News* published a detailed article about the money laundering and bribery scheme. The article noted that Costa had admitted to investigators through his testimony on October 8; 2014, that for at least, seven years, he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching

themselves." The article further stated that Costa had admitted that he personally received tens of millions of dollars and called the bribes from the companies a "three percent political adjustment." Costa named several construction companies that was part of the cartel including Odebrecht and Camargo Correa S.A.

71.     The article continued that, as part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud, overpricing and kickbacks" in, at least, seven contracs, including one contract for a 3.4 billion Brazilian reais coking unit and another contract for a 3.19 bilion Brazilian reais hydro-treater and related units. The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian reais. Indeed, according to federal court documents reviewed by *Bloomberg News,* Costa and Duque signed off on the coking unit and hydro-treater contracts and they sent them to Petrobras's executive board where they were approved. Moreover, in response to Costa implicating in the birbery investigation related to RNES, Duque responded that the "final decision on all contracts is made collectively by directors and the CEO."

72.     The article also noted that Costa had implicated Youssef for creating fake import Companies to launder the kickbacks. Consequently, Youssef had revealed to prosecutors and police in his own testimony "how he laundered money overseas from overpriced Petrobras contracts and how he distributed money from construction companies, in cash, to politicians."

73.     As a result of the revelations in the article by *Bloomberg News*, Petrobras's ADSs declined $0.80 per ADS or nearly 6%, to close at $13.20 per ADS on October 21, 2014.

74.     On October 27, 2014, before the market opened, the Company revealed that it had set up Internal Investigative Committees "to examine evidence or facts perpetrated against the company, as well as to assist administrative measures and resulting procedures."

75.     On the disclosure of the creation of the Internal Investigative Committees, Petrobras's ADSs declined $1.77 per ADS or nearly 14%, to close at $11.16 per ADS on October 27, 2014.

76.     On Saturday, the Brazilian newspaper, *O Estado de Sao Paulo*, reported that Petrobras's auditor, PricewaterhouseCoopers ("PWC") refused to sign off on the financial results for one of Petrobras's subsidiaries, Transperto, as they were signed by Sergio Machado ("Machado"), the Petrobras executive implicated by Costa. PWC urged the Company to take action to dismiss Machado. On November 3, 20143, Machado agreed to take a 31-day unpaid leave of absence to curb PWC's protest.

77.     The news that PwC refused to sign off on the Company's third quarter financial results, as independently confirmed by a news article in *BARRON's* on November. 3, 2014, caused Petrobras's ADSs to decline $0.44 per ADS or nearly 4%, to close at $11.26 per ADS on Monday, November 3, 2014.

78.     On Sunday, November 9, 2014, The Financial Times reported that the U.S. Department of Justice ("DOJ") had opened a criminal investigation on whether Petrobras or its employees were paid bribes and that the SEC had opened a civil investigation into the matter. Specifically, *The Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.

79.     On the reporting by various media outlets, that the DOJ and SEC had opened separate investigations into the bribery scandal, Petrobras's ADSs declined $0.28 per ADS or 2.5%, to close at $10.62 per ADS on N6vembei 10, 2014.

80.     On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company s financial statements." As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that since it would need additional time to:

> (i) deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of "Operacao Lava Jato;" and. (iii) evaluate the need of improving governance control, the Company isn't ready to publish its balance sheet regarding the third quarter of 2014 on this date.

81.     On  November 14, 2014, it was reported in various media outlets including *Reuters*, that the Brazilian police issued 27 arrest warrants and, arrested 18 individuals including Duque and Erton Medeiros Fonseca ("Fonseca"), a director of engineering and infrastructure at Galvao Engenharia S.A. Also, one of Petrobras's contractors, Odebrecht, confirmed that "its offices in Rio de Janeiro had been searched and documents seized."

82.     On the news of the arrests, Petrobras's ADSs declined $0.25 per ADS or nearly 2.5%, to close at $9.95 per ADS on November 14, 2014.

83.     On November 17, 2014, before the market opened, the Company had a conference call to discuss, its third quarter 2014 guidance. During the call, Foster noted that if Costa's accusations are true, they could potentially affect and "may lead to possible adjustment in, the financial statements of Petrobras. Foster revealed that the Company had been implementing "governance and management processes between 2012 and 2014." Accordingly, the Company's board of directors approved the creation of a compliance department.

84.     During the Q&A session, an analyst asked assuming the accusations of surcharge or overcharge are confirmed," what kind of accounting adjustments would need to be made in the Company's financial statements and what main line items would be impacted assuming "BRL

5 billion were overpriced in the construction of RNEST." Barbassa replied that the adjustments would be to the fair price of PP&E. If the allegations are true, Barbassa said there would be an overpayment, payment above what would be a fair value for a good or service. In this case, this value should be removed from PP&E line item, invested value and should be taken to the results." In determining fair value, Barbassa elaborated that the Company would need to deduct from PP&E "the amount that could be linked to bribery of any sort, any accepted price that would have been charged."

85.     Later in the day, in an article published by *Agencia Brasil,* Foster confirmed that SBM bribed Petrobras employees to win contracts. Foster stated that due to the "overwhelming evidence of noncompliance," SBM "will no longer be eligible to bid for further contracts with Petrobras." Moreover, Foster admitted the following: "We [were] informed in the past that we had identified no irregularities at this matter. After a few weeks or months, I was informed that there were indeed bribes to employees or former employees of Petrobras." Jose Formigli, Petrobras's Head of Exploration and Production, also revealed the following:

> The CEO received a call and a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands. This overwhelming evidence outright – it's the company's own admission that I was aware of [the bribery].

86.     As a result of the Company's conference call and revelation of SBM bribing Petrobras's employees, Petrobras's ADSs declined $0.62 per ADS or 6%, to close at $9.33 per ADS on November 17, 2014.

87.     In an article published by the *Wall Street Journal* on November 18, 2014, it was reported that since the arrests, Brazilian Federal Police had obtained a confession from Fonseca that "he paid roughly 4 million, Brazilian reais ($1.5 million) in bribes in order to win contracts from Petrobras. At least some of those contracts included projects at Petrobras's RNEST. As part

of Fonseca's confession, he revealed to the Brazilian Federal Police that he met Costa and a congressman in a meeting in 2010. The congressman told Fonseca "that to be able to win contracts, he would have to pay." Another contractor who was arrested on November 14, 2014 had confessed that "he paid $19 million and $23 million in bribes to Renato Duque."

88.     On November 20, 2014, it was reported in various media outlets in Brazil that a request was made to the Brazilian Prosecutor's Office in the Federal District and the Public Prosecutor at the Federal Audit Court for the immediate dismissal of Foster as the CEO of Petrobras and to establish a criminal inquiry into the matter. According to a news article published by *Folha de S.Paulo*, the request argued that Foster did not testify truthfully herself when she testified at a hearing on June 11, 2014 before a congressional investigation committee looking into the scandal, the Comissao Parlamentar de Inquerito. Specifically, Foster testified falsely that Petrobras didn't receive any warning from Netherland's authorities concerning bribery payments by SBM to Petrobras's employees.

89.     On November 24, 2014, a similar article in Brazilian newspaper *Globo*, reported that at the June 11, 2014 hearing Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by SBM. Forster answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees." Next, Foster was asked whether Petrobras already knew about the suspicion of bribery to Petrobras employees since 2012. Foster answered, "I do not confirm this information."

90.     On the news of Foster's testimony to the Comissao Parlamentar de Inquerito, Petrobras's ADSs declined $0.34 per ADS or 3%, to close at $10.50 per ADS on November 24, 2014.

91.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

92..    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Petrobras securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

93.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Petrobras securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Petrobras or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

95.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Petrobras;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Petrobras securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

98.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Petrobras securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Petrobras securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

99.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

101.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Petrobras securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Petrobras securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

104.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Petrobras securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Petrobras's finances and business prospects.

105.     By virtue of their positions at Petrobras, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative,

defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

106.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Petrobras securities from their personal portfolios.

107.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Petrobras, the Individual Defendants had knowledge of the details of Petrobras's internal affairs.

108.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Petrobras. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Petrobras's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Petrobras securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Petrobras's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired Petrobras securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

109.    During the Class Period, Petrobras securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Petrobras securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Petrobras securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Petrobras securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

110.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2014

Respectfully submitted,

**POMERANTZ LLP**

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
            fmcconville@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I,   Jonathan Messing   , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Petroleo Brasileiro S.A - Petrobras ("Petrobras" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Petrobras securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Petrobras securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Petrobras securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed ___12\11\14___
         (Date)

_____
(Signature)

_____
(Type or Print Name)

PETRÓLEO BRASILEIRO S.A. (PBR)                                    Messing

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 9/22/2014 | PUR | 2,000 | $17.5000 |
| 10/13/2014 | PUR | 1,000 | $16.0000 |
| 10/21/2014 | PUR | 1,000 | $13.5000 |
| 12/1/2014 | PUR | 1,000 | $10.0000 |
| 9/24/2014 | PUR | 1,000 | $17.5000 |
| 11/28/2014 | PUR | 1,000 | $10.8000 |